# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-2751

———————

Scott A. Medhaug,                               *
                                                *
              Appellee,                         *
                                                *    Appeal from the United States
      v.                                        *    District Court for the
                                                *    Northern District of Iowa.
Michael J. Astrue,                              *
Commissioner of Social Security,                *
                                                *
              Appellant.                        *

——————

Submitted: May 12, 2009
     Filed:  August 26, 2009

———————

Before RILEY, SMITH, and COLLOTON, Circuit Judges.

———————

RILEY, Circuit Judge.

Scott A. Medhaug (Medhaug) applied to the Social Security Administration (SSA) for disability insurance benefits and supplemental security income (collectively, benefits). After a hearing, the administrative law judge (ALJ) denied Medhaug's claim, finding Medhaug retained the ability to perform his past relevant work. The SSA Appeals Council declined to review the ALJ's decision. Medhaug appealed to the district court which reversed the ALJ and awarded benefits. The Commissioner of Social Security (Commissioner) now appeals the district court's judgment asserting (1) the district court erred in finding the Commissioner's decision was not supported by substantial evidence on the record as a whole, and (2) even if

the Commissioner's decision were not supported by substantial evidence, the district court erred by awarding benefits, rather than remanding to the agency for further consideration. We conclude the Commissioner's decision was supported by substantial evidence, and we affirm the ALJ.

## I.     BACKGROUND
### A.     Medical History

Medhaug first injured his back while serving in the United States Army during the first Persian Gulf War. Medhaug sustained the injury when he stood up from a sitting position while carrying "full gear." In 1992, Medhaug received a medical discharge from the military as a result of his back condition.

Medhaug began seeking treatment from the Department of Veterans Affairs Medical Center (VAMC) in May 2002.[1] When Medhaug first reported to the VAMC, Medhaug explained he had a ten-year history of back pain and associated leg pain, which had "gotten worse over the past two years." Medhaug underwent an MRI which revealed "[l]umbar spondylosis[2] with disc bulges and mild [neural foraminal narrowing],[3] but no frank nerve root impingement or central canal stenosis." Medhaug was provided steroid injections at the VAMC pain clinic, and was prescribed oral pain medications.

---

[1]The Administrative Record in this case is disorganized and incomplete, making it difficult to determine exactly when Medhaug began his treatment at the VAMC, and what treatment was provided.

[2]Spondylosis is the immobility and fusion of vertebral joints. The report may have meant "spondylosis thesis," meaning the forward displacement of a vertebra. As used here, the term describes the degeneration of the disc spaces between the vertebrae in Medhaug's spine.

[3]In Medhaug's case, the "foraminal narrowing" is a narrowing of an opening in Medhaug's spinal column.

Medhaug returned to the VAMC in November 2002, and reported he was "[a]ble to work," but he was "in constant pain" from his back condition. Medhaug stated he took oral pain medication and limited his activity when the pain was severe. Losing weight helped reduce the back pain. Medhaug continued to seek treatment from the VAMC over the next year.

In July 2003, Medhaug was seen at the VAMC, and he reported his pain was at a level four out of ten, and extensive physical activity with lifting aggravated the pain. Medhaug also stated mild exercise made him feel better, and he engaged in such exercise at home. Medhaug received another MRI, and the radiologist reviewing the MRI concluded Medhaug had degenerative disc disease in vertebrae L3 through S1, and mild right neural foraminal narrowing from L4 through L5. The radiologist also found "[l]eft paracentral disk protrusion" from L1 through L2, which contributed to "some mild central canal narrowing." Medhaug's pain was treated with steroid injections, and Medhaug continued to take oral pain medications when needed.

In October 2003, Medhaug returned to the VAMC for treatment, reported his pain was at a level four, and stated he continued to exercise at home, which made him feel better. Medhaug indicated his last steroid injection lasted for two months. He began to experience pain again in the third month, but "was satisfied with the result." VAMC clinicians provided Medhaug with another steroid injection and continued Medhaug's prescription pain medications. During the visit, Medhaug was "in no apparent distress [and was] ambulating without any problems." The following month, Medhaug called the VAMC and reported he had not experienced any pain relief as a result of the last steroid injection. On December 10, 2003, Medhaug left a message with the pain clinic indicating his pain was still not under control. Later that month, on December 31, 2003, Medhaug contacted the VAMC and reported he was experiencing constant back pain at a level of seven or eight. Medhaug explained he had not experienced any pain relief after the last steroid injection, he had difficulty standing and sitting, and his pain was interfering with his ability to sleep.

On January 12, 2004, Medhaug was provided another steroid injection. During the visit, Medhaug "complain[ed] of dull, aching pain present over the lower back in an axial distribution with occassional [sic] pain extending into the thigh and numbness down the right leg." The clinician noted Medhaug "ambulate[d] unassisted with a normal gait." Medhaug called the VAMC on January 29, 2004, and stated he did not experience any relief from the steroid injection. Medhaug insisted the pain had become more severe over the last few days and the pain was impacting his ability to sleep and engage in activity.

The pain clinic referred Medhaug for a psychology consult, and on March 1, 2004, Medhaug attended a psychological interview. During the interview, Medhaug indicated he had chronic lower back pain which interfered with his sleep, and lifting exacerbated his pain. However, Medhaug reported he took Tylenol and a muscle relaxant when the pain was most severe, which would help him sleep. Medhaug expressed his belief that he needed surgery, but was denied surgery because "his pain [was] not bad enough." The staff psychologist's assessment noted, Medhaug's "insistence on a medical cure for his [lower back pain] raises questions about his receptiveness to alternative approaches to pain management. However, the approach of psychology helping [patients] cope with chronic pain was addressed with [Medhaug] and he was provided with a pain meditation tape and advised to return."

Medhaug returned to the VAMC Psychology Department on March 23, 2004, for psychotherapy. Medhaug insisted "his current approaches to dealing with both his pain and his insomnia are the only realistic options available to him." While Medhaug acknowledged chronic pain may be a lifelong reality for him, he dismissed the idea of using psychological pain management techniques. Medhaug and the staff psychologist agreed further psychological treatment "was not indicated."

On May 7, 2004, Medhaug returned to the VAMC Pain Clinic and reported continued lower back pain occasionally extending to his thigh and right leg. Once

again, the clinician noted Medhaug "ambulate[d] unassisted with a normal gait." Medhaug was prescribed a new medication. At a follow-up appointment on August 11, 2004, Medhaug reported the trial medication did not help him much. The clinician recorded Medhaug was "in no apparent distress [and] ambulat[ed] unassisted."

On or about June 13, 2004, Medhaug contacted the VAMC and requested VAMC staff send information to child support recovery services stating Medhaug was disabled. A nurse practitioner notified Medhaug that he would only be disabled if he could not perform the "duties of any job." Medhaug angrily responded that "he [couldn't] do any job, such as physical labor." The nurse practitioner explained that in order to be considered disabled, Medhaug needed to be unable to perform the duties of any job, even those which would not require physical labor.

Medhaug received another MRI on September 23, 2004. This MRI revealed "[m]ild degenerative changes," but "[n]o significant change when compared to prior study." Medhaug attended a follow-up appointment on October 1, 2004, and reported his "back pain [was] not stable and the medication [was] controlling the pain." Medhaug also noted the "[p]ain [was] keeping him up all the time," but "[h]e ha[d] taken some muscle relaxants and those help[ed]." On October 13, 2004, Medhaug called the VAMC, indicated he increased his pain medication, and the increased dosage was working.

On November 8, 2004, the VAMC conducted x-rays of Medhaug's spine. The x-rays showed "[s]light anterolisthesis[4] of L3 in relationship to L2," and "[m]ild to moderate spondylosis of the lumbar spine." A resident physician reviewed Medhaug's latest MRI and x-ray, and reported "mild degenerative changes, no

---

[4]Anterolisthesis occurs when the upper vertebral segment has shifted forward relative to the lower segment. See Cedars-Sinai Medical Center, Health Conditions, http://www.csmc.edu/5727.html (last visited July 30, 2009).

significant neural compression," and "no instability." The resident physician recommended nonsurgical management, and a supervising physician agreed.

The VAMC continued to treat Medhaug with various prescription pain medications and occasional steroid injections over the next several years. Medhaug continued to complain of similar pain, sometimes indicating the pain was controlled through medication and steroid injections, and other times reporting the pain was not controlled. Medhaug's final MRI in this record was conducted on November 1, 2005. This MRI appears to demonstrate findings similar to Medhaug's previous MRI's; however, the radiologist did not expressly compare the MRI with previous images, making the results difficult for us to compare. Medhaug's treatment did not change.

## B.    Application for Benefits

On August 23, 2004, Medhaug applied to the SSA for disability benefits. Medhaug claimed his disability began on November 30, 2003, the same date he was laid off as a laborer for an electric company for reasons unrelated to his injury. In his disability report, Medhaug indicated, after he was laid off and became disabled, he worked part-time as a computer technician for nine months, as a taxi cab driver for four months, and as a laborer at a manufacturing company for less than one month, with some of the positions overlapping.

To support his claim for disability benefits, Medhaug submitted a letter from Dr. William Iverson (Dr. Iverson), Medhaug's treating physician, which was dated October 28, 2004. This letter stated:

> Scott Medhaug is a patient under my care at the VAMC in Iowa City. He has chronic back pain and has suffered with it for more than 10 years. He has several disc bulges on his latest MRI[.] [W]hile severe enough to cause him pain and limitation[,] nothing can be done surgically at this time.

He has constant daily back pain, which severely limits his activity. He is unable to bend, lift or stand for any long period of time. He also cannot sit for a long period of time without getting up to move around due to the pain. In addition, his sleep is severely limited with the pain. He does not sleep regular hours and often times falls asleep any time during the day when the pain wears him out. Based on these problems, it is almost impossible for him to hold a full time job. He is also limited in many of the available part-time jobs as well.

During oral argument, Medhaug's counsel indicated he was not sure if Dr. Iverson's letter was drafted to support Medhaug's disability claim or to notify child support enforcement authorities Medhaug was limited in his ability to work.

As part of his claim for disability benefits, Medhaug received a psychological evaluation by Dr. Glenn F. Haban (Dr. Haban) on October 21, 2004. Dr. Haban noted Medhaug's "gait was somewhat slow, but steady," and "[h]is sitting posture was relaxed, without obvious pain behaviors." Dr. Haban concluded, "[t]he mental status examination [was] suggestive of an adjustment disorder with depressed mood," but Medhaug's mental state did not limit Medhaug's ability to do work related activities.

The Iowa Disability Determinations Services evaluated Medhaug's application for disability benefits on two separate occasions, once during an initial review, and again upon reconsideration. During the evaluation and reevaluation process, multiple professionals reviewed Medhaug's medical records. Jan Hunter, D.O., concluded there was evidence showing Medhaug had mild degenerative disc disease, unassociated with any neurosensory defect, and doubted the credibility of Medhaug's complaints of pain and significant limitations due to "the absence of objective findings on physical examination supportive of this degree of restriction." Dr. J.D. Wilson (Dr. Wilson) agreed and questioned the contents of Dr. Iverson's letter because Medhaug's "current exams [were] essentially normal as [Medhaug] ha[d] good strength, sensation and gait and [Medhaug was] also able to do current [activities of daily living] without any assistance." The first psychologist to review Medhaug's records found

-7-

Medhaug's impairments not severe and opined Medhaug suffered from adjustment disorder with depressed mood, but found this disorder resulted in only mild restrictions on Medhaug's daily activities. A second clinical psychologist, upon reconsideration of Medhaug's claim, agreed with these findings without further explanation.

Medhaug's application for benefits was denied initially on December 29, 2004, and again after reconsideration of his claim on February 14, 2005. Medhaug filed a timely written request for an administrative hearing on March 15, 2005.

### C.    Administrative Proceedings and Subsequent Litigation

On August 10, 2006, Medhaug's administrative hearing was held by video teleconference. The hearing lasted 23 minutes. Medhaug did not have counsel present at the hearing. The ALJ informed Medhaug of his right to have counsel present, and offered to continue the hearing to allow Medhaug an opportunity to seek counsel, but Medhaug declined.

During the hearing, Medhaug testified he has a bachelor of arts in "Studies in Religion." Medhaug testified he was "in pain all the time," which prevented him from sleeping, and "from doing a lot of things." Medhaug explained his pain was caused by "deteriorated disks and herniated disks" in his back. Medhaug reported the VAMC had recently conducted nerve damage testing, and the results demonstrated Medhaug did not have any nerve damage. Medhaug indicated he tries to do all of his own chores, such as cleaning, shopping, and cooking, and he occasionally mows the lawn when he is feeling really well. When the ALJ asked Medhaug how much weight Medhaug could lift, Medhaug reported it was very painful to pick up his four-year-old daughter. Medhaug also stated he could pick up a forty-pound bag of dog food, but it would be "very painful" and he would suffer later. Medhaug reported he could lift an eight-pound gallon of milk without pain, but lifting a twenty-pound case of pop would cause him a lot of pain.

Medhaug reported he could only sit for a couple of hours before he needed a ten to fifteen minute break to walk around, but the big problem would be getting out of the chair, not necessarily the time sitting. Medhaug also claimed he could stand for "a half an hour or more," and approximately three weeks before the hearing, Medhaug walked a total of four miles to and from church. Medhaug further testified the steroid injections he was receiving helped relieve some of his pain. When asked how he supported himself, Medhaug stated he was working as a school bus driver, five days a week, for two to three hours in the morning, and then again for two to three hours in the afternoon. However, Medhaug testified he often took days off when he was in pain, and "if they knew at work how much medication [he] was taking, they would . . . dismiss [him]." Medhaug had been working in that capacity since October 2005. Medhaug also testified he received disability support and compensation from the VA.

A vocational expert also testified at the hearing. The ALJ presented the vocational expert with a hypothetical, asking whether a forty-nine-year-old man with a college education and Medhaug's past work history, with a diagnosis of degenerative disk disease, who was limited to lifting twenty pounds occasionally and ten pounds frequently, and further limited to being on his feet a total of two hours per day, with only occasional balancing, stooping, crouching, kneeling, crawling, or climbing, could perform Medhaug's past relevant work. The vocational expert stated such a person could work in Medhaug's previous positions as a "[c]omputer operator, user support analyst, and taxi driver." The ALJ then presented the vocational expert with a second hypothetical, asking if the same person described above would be employable if he required two absences per month and two or more unscheduled breaks per day. The vocational expert replied in the negative.

The ALJ denied Medhaug's application, finding Medhaug was not disabled under the SSA. Medhaug appealed his claim to the SSA Appeals Council, and the Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Medhaug sought judicial review of the

Commissioner's decision.  The district court reversed the Commissioner's denial of benefits, finding the ALJ did not give sufficient weight to the opinion of Medhaug's treating physician and Medhaug's own subjective complaints of pain, and "erred in raising a question as to whether [Medhaug's] restricted work activities were self-imposed for child support or vocational rehabilitation reasons."  Without further explanation, the district court declared "the ALJ's decision [was] not supported by substantial evidence on the record as a whole," and concluded Medhaug was "unable to engage in substantial gainful activity."  The district court awarded disability benefits without remanding to the SSA for further consideration.  The Commissioner appeals the district court's reversal and award of benefits.

## II.   DISCUSSION
### A.    Standard of Review

"We review de novo the District Court's determination of whether substantial evidence on the record as a whole supports the ALJ's decision."  Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006) (citation omitted).  "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole."  Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998) (citation omitted).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005) (citation omitted).  We must consider evidence that both supports and detracts from the ALJ's decision, but we will not reverse an administrative decision "simply because some evidence may support the opposite conclusion."  Id. (citation omitted).  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  Id. (citation omitted).

### B.    Regulatory Process and the ALJ's Decision

"To receive disability benefits, [Medhaug] must establish a physical impairment lasting at least one year that prevents [him] from engaging in any gainful activity."

Kelley, 133 F.3d at 587 (citation omitted). It is Medhaug's burden to prove he is disabled. See Goff, 421 F.3d at 790 (citation omitted). "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhardt, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted). "The Commissioner's regulations governing determinations of disability set forth a five-step sequential evaluation process which the Commissioner must use in assessing disability claims." Goff, 421 F.3d at 789-90 (citations omitted). In conducting the five-step evaluation, the ALJ must

> determine[]: 1) whether the claimant is presently engaged in a "substantial gainful activity;" 2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; 3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations . . .; 4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and 5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Kelley, 133 F.3d at 587-88 (citation omitted).

The ALJ in Medhaug's case conducted the required five-step sequential evaluation of Medhaug's claim. At the first step, in evaluating whether Medhaug was engaged in a "substantial gainful activity," the ALJ noted Medhaug was laid off from his position as a laborer for an electric company on November 30, 2003. The ALJ also discussed Medhaug's work since Medhaug's alleged onset of disability, including Medhaug's work as a taxi cab driver from April 2004 to August 2004, as a laborer in August of 2004, and at an electrical company in 2005. At the time of the administrative hearing, Medhaug was employed as a school bus driver and as a computer technician, and was receiving food stamps and supplemental payments from the VA. The ALJ noted Medhaug's current work, particularly his work as a school

bus driver, would likely "exceed average monthly substantial gainful activity limits." However, without verification of Medhaug's earnings, the ALJ proceeded with the sequential evaluation, concluding, "The claimant has not engaged in substantial gainful activity since November 30, 2003, the alleged onset date."

At the second step, the ALJ considered whether Medhaug had a severe impairment and found, "The claimant has the following severe combination of impairments: mild degenerative disc disease and adjustment disorder with depressed mood as well as a history of depression." The ALJ stated Medhaug's "impairments, when considered in combination, could reasonably be expected to impose work-related limitations." As a result, the ALJ continued to the third step, and concluded Medhaug's impairments were not equal to any of the presumptively disabling impairments listed in the regulations.

At the fourth step, the ALJ conducted an evaluation of the record and "accorded weight to the mental and physical limitations assessed" by the Iowa Disability Determinations Services. "However, based on the ongoing medical treatment history as well as the testimony of [Medhaug], the [ALJ found] it reasonable to further restrict [Medhaug's] residual functional capacity." Accordingly, the ALJ found Medhaug "ha[d] the residual functional capacity to perform work which require[d] lifting 20 pounds occasionally and 10 pounds frequently; standing 2 hours in an 8-hour workday and occasionally balancing, stooping, crouching, kneeling, crawling[,] and climbing due to degenerative disc disease." The ALJ concluded, however, that even with Medhaug's limited residual functional capacity, Medhaug was "capable of performing [his] past relevant work as [a] taxi cab driver, user support analyst and computer operator."

In making this finding, the ALJ considered (1) the objective medical evidence; (2) the opinion evidence submitted by the physicians and psychologists involved in Medhaug's treatment and the evaluation of his claim; (3) the testimony of the

-12-

vocational expert; and (4) Medhaug's own reported symptoms. After reviewing this evidence, the ALJ discredited Dr. Iverson's letter because it was not "entirely supported by the medical treatment record which documented occasional exacerbations of pain which responded to medical intervention." The ALJ also discredited Medhaug's subjective statements of pain, explaining, Medhaug's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but [Medhaug's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" because the record demonstrates Medhaug has responded to medical treatment, and the "repeated MRI studies have failed to evidence significant progression in the level of degeneration to support deterioration in functional abilities." Based upon the testimony of the vocational expert, the ALJ concluded, Medhaug had the ability to perform his past jobs as a "taxi cab driver, user support analyst and computer operator[,] as he performed the work at the sedentary level." Because the ALJ concluded Medhaug was not disabled as defined under the SSA at step four of the sequential analysis, the ALJ did not continue to step five.

### C.     Substantial Evidence

The question before us is whether there was substantial evidence to support the ALJ's findings. We conclude the ALJ did not improperly discredit the letter written by Dr. Iverson and Medhaug's subjective statements regarding his limitations, because there was substantial evidence on the record as a whole to support the ALJ's decision.

### 1.     Dr. Iverson's Letter

"'[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Goff, 421 F.3d at 790 (quoting Reed v. Barnhardt, 399 F.3d 917, 920 (8th Cir. 2005) (internal marks omitted)). "'A treating physician's opinion does not automatically control, since the record must be evaluated as a whole.'" Id. (quoting Bentley v. Shalala, 52 F.3d 784,

786 (8th Cir. 1995) (internal marks omitted)). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

The record before us includes four separate MRI's, each of which found evidence Medhaug suffers from a mild form of degenerative disc disease, and none of the MRI's demonstrate any nerve root impingement. Medhaug's records indicate he is not a candidate for surgery, and Medhaug's condition must be controlled through nonsurgical medical management. Medhaug is not willing to use psychological pain management techniques. Medhaug repeatedly told VAMC health care providers the medication and steroid injections he was receiving controlled his pain. On October 1, 2004, shortly before Dr. Iverson drafted his letter, Dr. Iverson indicated Medhaug's "medication is controlling the back pain." Again, on January 28, 2005; December 16, 2005; and June 16, 2006, Dr. Iverson noted Medhaug's "back pain [wa]s stable and the medication [wa]s controlling the pain." At the administrative hearing Medhaug testified the steroid injections he was receiving helped relieve his pain, which is consistent with Medhaug's statements to Dr. Iverson and Medhaug's other health care providers. Thus, Medhaug's medical records provide information which is inconsistent with the statements in Dr. Iverson's letter, and establish a reasonable basis for discrediting the statements in Dr. Iverson's letter.

Further, the conclusory statements in Dr. Iverson's letter that Medhaug "cannot sit for a long period of time without getting up to move around," and that "it [would be] almost impossible for him to hold a full time job," were also contradicted by Medhaug's testimony at the administrative hearing that he was currently employed as a school bus driver, working approximately six hours a day, five days a week.

-14-

Two other physicians examined Medhaug's medical records for purposes of evaluating Medhaug's claim for benefits. Each of the physicians concluded the objective findings of Medhaug's medical examinations did not support the high level of restriction suggested by Dr. Iverson's letter. Because Dr. Iverson's letter was inconsistent with other evidence in the record, the ALJ's decision to discredit Dr. Iverson's opinion was supported by the record as a whole and was not improper. See Goff, 421 F.3d at 790-91.

### 2. Medhaug's Subjective Allegations of Pain

According to our precedent,

> When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.

Kelley, 133 F.3d at 588 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (establishing the Polaski factors)). "'[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them.'" Goff, 421 F.3d at 792 (quoting O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003)). "However, '[t]he ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'" Id. (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)).

The ALJ considered the factors listed above, and determined Medhaug was "credible to the extent that he ha[d] been diagnosed and treated for a degenerative condition which produces variable levels of pain with episodes of exacerbation." However, the ALJ recognized, "the repeated MRI studies have failed to evidence significant progression in the level of degeneration to support [Medhaug's allegations of] deterioration in functional abilities."

The ALJ did not rely solely on the objective medical evidence, but also considered Medhaug (1) responded to medical treatment, (2) "engaged [in] and sustained work activity which would exceed [Medhaug's] reported limitations," and (3) "maintained activities of daily living with minimal accommodation." Based upon these considerations, the ALJ concluded Medhaug's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but [Medhaug's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible."

First, the ALJ properly considered Medhaug's own statements, and the statements of his physicians, that Medhaug's pain was often controlled with prescription pain medication and steroid injections, when discrediting Medhaug's subjective complaints. See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (concluding an impairment cannot be considered disabling if it can be controlled through treatment or medication).

Second, it was proper for the ALJ to consider each of the employment positions Medhaug maintained after his alleged onset of disability, because "[w]orking generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citation omitted). The ALJ took particular notice of Medhaug's position as a school bus driver at the time of the administrative hearing, which required Medhaug to sit for approximately six hours per day. It was also relevant that Medhaug did not leave his position as a laborer for an electric company on November 30, 2003, because of any back injury. See Goff, 421 F.3d at 793 (explaining it is "relevant to credibility when a claimant leaves work for reasons other than [his] medical condition") (citation omitted)). Medhaug was laid off from the position due to a decline in work, and Medhaug claimed the date he was laid off was the same date of the alleged onset of disability.

-16-

Third, acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain. See Goff, 421 F.3d at 792; Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1448 (8th Cir. 2001). During the administrative hearing, Medhaug testified he did all of his own chores, including cooking, cleaning, and grocery shopping, he had recently walked four miles round trip to church and back, and he occasionally mowed his lawn. See also Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (concluding "daily activities [such] as getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" are inconsistent with a claimant's subjective complaints of disabling pain).

Based upon (1) the ALJ's evaluation of the objective medical evidence, (2) Medhaug's work history since the date of his alleged onset of disability, and (3) Medhaug's reported activity level which was inconsistent with his allegations of disabling pain,[5] we will not disturb the ALJ's decision to discredit, in part, Medhaug's subjective complaints.

We therefore conclude it was not improper for the ALJ to discount the statements in Dr. Iverson's letter and Medhaug's subjective complaints of pain, and we reverse the district court's conclusion the ALJ erred in its credibility findings. Substantial evidence on the record as a whole supports the ALJ's findings, and as a result, we need not decide whether the district court erred in failing to remand to the ALJ for completion of the sequential evaluation of Medhaug's claim.

---

[5]The ALJ had a sufficient basis to discount Medhaug's subjective statements of pain for these reasons, and we need not address whether it was error for the ALJ to consider "whether [Medhaug's] restricted work activities were self-imposed for child support or vocational rehabilitation reasons."

## III. CONCLUSION

The district court's judgment is reversed, and the Commissioner's final decision to deny Medhaug's application for benefits is affirmed.

_____