# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3555

_____

| | | |
|---|---|---|
| Steve L. McCoy, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Michael J. Astrue, Commissioner of | * | |
| the Social Security Administration, | * | |
| | * | |
| Appellee. | * | |
| | * | |

_____

Submitted: May 11, 2011
Filed: August 4, 2011

_____

Before MURPHY, BEAM, and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Appellant Steve McCoy challenges the district court's[1] affirmance of the Social Security Administration's (SSA) denial of McCoy's claim for disability benefits. We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

## I.    BACKGROUND

McCoy alleges he is disabled as a result of Post Traumatic Stress Disorder (PTSD), Parkinson's disease, Attention Deficit Disorder (ADD), and peripheral neuropathy.  McCoy contends that the mental and physical limitations he has as a result of these conditions, combined with his advanced age and limited job skills, render him unable to perform any work available in the national economy.

McCoy, born on April 25, 1949, was 53 years old at the time of his alleged disability-onset date and 56 years old on his date last insured.  McCoy has a general equivalency diploma, which he earned while serving in the military.  McCoy's three years of military service included a deployment to Vietnam.  His service ended with a dishonorable discharge, leaving him ineligible for veterans benefits.  McCoy failed to provide the Administrative Law Judge (ALJ) with a complete and detailed overview of his post-military work history.  However, it appears McCoy worked intermittently in a number of unskilled jobs, including in positions as an automatic machine attendant, a product tester, and a packer.  The record indicates McCoy worked as a heavy general laborer between 1987 and 1993 and worked other short-term temporary jobs between 1993 and March 2001.  McCoy has not worked outside the home since March 2001.

On October 26, 2004, McCoy filed an application for benefits, alleging disability beginning on September 15, 2000.  After McCoy's claim was denied initially and on reconsideration, he requested a hearing, which was held on January 17, 2007.  At the hearing, McCoy amended his alleged disability-onset date to February 1, 2003.  McCoy stopped working in March 2001, and his date last insured was March 31, 2006.  Thus, to qualify for disability benefits, McCoy is  required to prove that he was disabled between February 2003 and March 2006.  See Tilley v. Astrue, 580 F.3d 675, 676 (8th Cir. 2009).

On October 28, 2002, four months before his alleged disability-onset date, McCoy saw his primary care physician, Steven Saathoff, M.D., complaining of hand tremors, trouble sleeping, intrusive thoughts, depression, and anxiety. Upon examining McCoy, Dr. Saathoff noted that McCoy retained normal muscle strength and gait, but observed a fine tremor in McCoy's hands. Dr. Saathoff prescribed McCoy medicine for his PTSD symptoms, but did not prescribe any medication for McCoy's tremor at that time.

Over the next three years, McCoy made a series of visits to various healthcare providers. This series included several trips back to Dr. Saathoff, visits with neurologist John Puente, M.D., and, beginning in 2004, weekly visits with a licensed mental health practitioner Janet Waage Lingren, Ed. D. Dr. Saathoff continued to treat McCoy's PTSD symptoms with medication, and monitored his hand tremor, eventually prescribing medication for that as well. In 2004, Dr. Saathoff referred McCoy to Dr. Puente for further evaluation and treatment of his hand tremor. Dr. Puente concluded that McCoy's tremor likely was partially caused by his PTSD but that it also seemed to have an "essential" neurological component. Eventually, Dr. Puente diagnosed McCoy with "likely" Parkinson's disease and treated him accordingly. Starting in 2004, McCoy also had weekly sessions with Dr. Lingren, who provided general counseling and "neurofeedback" to treat McCoy's PTSD symptoms. In addition to regularly visiting these treating physicians, McCoy underwent a number of consultative disability evaluations between 2003 and 2007, visiting Ruilin Wang, M.D., psychologist William R. Stone, Ph.D., agency psychologist Linda Schmechel, Ph. D., psychiatrist Mohammad S. Kamal, M.D., and neuropsychologist Robert Arias, Ph.D. The administrative record contains extensive documentation of these medical visits.

The healthcare providers who treated and examined McCoy came to somewhat varied conclusions about the severity of McCoy's condition and the significance of his resulting limitations during his insured period. McCoy's counselor, Dr. Lingren,

expressed the most significant concerns about the limitations that McCoy's condition would impose on his ability to work. Ultimately, she concluded in a 2005 report prepared in conjunction with McCoy's disability application that McCoy's "ability to do work related activities such as sitting, standing, lifting, carrying, and handling objects has been dramatically compromised because of the tremors" and that his ability to concentrate and sustain social interactions was "very limited" because of his PTSD and Parkinson's-related symptoms. At one point, Dr. Puente also indicated that McCoy had significant cognitive limitations; in a 2005 Residual Functioning Capacity (RFC) assessment, Dr. Puente noted "marked" limitations in areas related to memory and concentration.

On the other hand, a number of the healthcare providers who treated McCoy during this same period concluded that his physical and mental limitations were minor and that his most significant limitations were social and emotional. During a July 2004 exam, Dr. Saathoff noted that, despite McCoy's tremor, McCoy retained muscle strength rated at "5/5" in his upper and lower extremities and a "normal" gait. In 2004, Dr. Stone, who performed multiple consultative exams on McCoy, noted that McCoy did not display "any remarkable involuntary movements [or] gross peculiarities of posture or gait" and that, despite a diagnosis of PTSD, McCoy was generally capable of performing mental work-related functions. Dr. Stone did note that, as a result of his PTSD and personality disorder, McCoy had some prohibitive social limitations that undermined his ability to engage in ongoing interaction with the public or cooperative work with supervisors or coworkers. Similarly, in 2005, Dr. Kamal saw McCoy for a consultative exam and concluded that McCoy had the ability to concentrate on and complete tasks and to follow and complete instructions, but that he may have a limited ability to relate to coworkers and supervisors because of his PTSD-related symptoms. Neuropsychological testing conducted by Dr. Stone in 2005 also revealed no significant memory or cognitive impairment. After reviewing the test results, Dr. Stone concluded McCoy was "generally capable of sustaining concentration and attention" with only brief periods of "decreasing frequency" where

intrusive thoughts reduced his attention capacity to "low average" and that his social impairments would not "be prohibitive in the kinds of relatively superficial relationships typical for jobs." Similarly, a neuropsychological exam conducted by Dr. Arias in January 2007–after McCoy's insured status had expired–indicated moderate memory-retrieval impairment but noted otherwise normal cognitive performance with perceptual-organization skills in the "superior" range.

In addition to the voluminous medical evidence, the ALJ also considered evidence of McCoy's daily activities during his insured period. In 2003, McCoy filled out a Daily Activities and Symptoms Report. He indicated that his activities included gardening, mowing the lawn, watching television, and visiting his family. McCoy's wife filled out a Supplemental Information Form at the same time, indicating that McCoy helped with childcare and pet care and that he "independently and appropriately" assisted with home-schooling his autistic daughter. In a December 2004 Supplemental Disability Report, McCoy continued to indicate he did yard work, gardened, and drove three times per week. As late as July 2006, McCoy reported mowing the lawn in the high heat. However, at his disability hearing, McCoy indicated that he could not do "anything" at home because of his inability to focus and because of his neuropathy. Upon further questioning, McCoy admitted that he helped get his children ready for school, helped home-school his daughter, occasionally drove, and helped with the children once they got home from school. However, he maintained that he was not able to focus on any of this because of intrusive thoughts. McCoy also said that he used a cane all the time because he was in significant pain, but that he did not have the cane with him that day because it was broken. McCoy further indicated that he could only walk about fifty feet and that he could not wear shoes.

After considering the medical evidence and McCoy's testimony, the ALJ examined Michael McKeeman, a vocational expert (VE). Based on the ALJ's evaluation of the evidence, the ALJ posed a hypothetical to McKeeman about

whether someone in McCoy's position would be able to find work in the national economy.[2]  The ALJ asked what jobs would be available to a worker with McCoy's age, education, and work experience who: (1) could do only routine repetitive unskilled work with ordinary supervision; (2) could not set goals or deal with job changes; (3) could have only brief or superficial interactions with coworkers, supervisors, and the public; and (4) was limited to occasional fingering due to a mild tremor.  The VE said a person in that position could perform approximately fifty percent of light or medium jobs and would have a "wide range" of employment options.  The VE noted, however, that if he took McCoy's testimony at the hearing as fully credible–including his claims that he could only walk fifty feet and could not wear shoes–McCoy would likely not be able to find work in the national economy.

On July 19, 2007, the ALJ issued a written opinion finding that McCoy was not disabled within the meaning of the Social Security Act.  The Appeals Council denied McCoy's request for review.  McCoy filed a complaint in federal district court challenging the denial of his claim.  The district court affirmed, and McCoy appeals.

## II.    DISCUSSION

We review de novo a district court decision upholding a denial of Social Security disability benefits.  Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002).  However, we review the underlying ALJ decision under a deferential "substantial evidence" standard, and will affirm if, based on the record as a whole, a reasonable mind could accept the ALJ's decision.  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008).  "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

---

[2]Because the details of McCoy's work history were unclear, the ALJ assumed McCoy could not perform relevant past work.

findings, we must affirm the denial of benefits." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quotation omitted).

The SSA has established a five-step sequential process for evaluating disability claims. In step one, the ALJ decides whether the claimant is currently engaging in substantial gainful activity; if the claimant is working, he is not eligible for disability insurance benefits. 20 C.F.R. § 404.1520(b). In step two, the ALJ determines whether the claimant is suffering from a severe impairment. If the claimant is not suffering a severe impairment, he is not eligible for disability insurance benefits. 20 C.F.R. § 404.1520(c). At the third step, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in Appendix 1 of the regulations (the "listings"). 20 C.F.R. § Pt. 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is entitled to benefits; if not, the ALJ proceeds to step four. 20 C.F.R. § 404.1520(d). At step four, the ALJ determines whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work. If the claimant remains able to perform that past relevant work, he is not entitled to disability insurance benefits. 20 C.F.R. § 404.1520(f). If he is not capable of performing past relevant work, the ALJ proceeds to step five and considers whether there exist work opportunities in the national economy that the claimant can perform given his or her medical impairments, age, education, past work experience, and RFC. 20 C.F.R. § 404.1520(g). If the Commissioner demonstrates that such work exists, the claimant is not entitled to disability insurance benefits. Id.

Here, the ALJ applied the proper legal framework and found that McCoy (1) was not engaged in gainful activity; (2) did have severe impairments–Parkinson's disease, PTSD, and a personality disorder; (3) did not meet the requirements of any "listing" condition; (4) could not perform relevant past work; and (5) was capable of performing jobs available in the national economy. Based on these findings, the ALJ concluded that McCoy was not entitled to benefits.

McCoy argues that the ALJ's analysis was erroneous in two respects. First, McCoy argues the ALJ erred at step three by concluding that McCoy did not meet the requirements of the Parkinson's disease listing. Second, McCoy argues the ALJ erred in its RFC determination and its conclusion that McCoy is capable of performing work in the national economy. We reject both arguments because the ALJ's findings at each step were supported by substantial evidence.

## A.    Step Three

McCoy's first argument is that the ALJ erred at step three of the sequential evaluation by deciding that McCoy's impairments did not meet or exceed the criteria of the presumptively disabling Parkinson's disease listing. To qualify for disability under a listing, a claimant carries the burden of establishing that his condition meets or equals all specified medical criteria. Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995). Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). The listing criteria for establishing "Parkinsonian syndrome" are "[s]ignificant rigidity, brady kinesia, or tremor in two extremities, which, singly or in combination, result in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.06. There is substantial evidence supporting the ALJ's step three conclusion that, prior to the expiration of his insured status, McCoy did not meet or equal these criteria.

The ALJ concluded that McCoy did not satisfy the section 11.06 listing requirement because there was no evidence that, during his insured period, McCoy had a sustained disturbance in either dexterous *and* gross movement, or gait and station. Even assuming, as McCoy argues, that the ALJ's finding that McCoy is

limited to only occasional fingering because of his tremor implies that McCoy has a sustained disturbance in *dexterous* movement, this is not enough to support a finding of disability under section 11.06. There is substantial evidence supporting the ALJ's finding that McCoy has failed to establish any sustained disturbance in either gross movement or gait and station.

Dr. Puente–the neurologist who diagnosed McCoy with Parkinson's disease– repeatedly noted that McCoy's gait was relatively normal. There is no indication in any of Dr. Puente's notes that McCoy's tremor was having a sustained effect on anything other than his fine-motor movements. Dr. Puente's observation that McCoy suffered from a "very small degree of cogwheel rigidity" does not compel a finding that McCoy had a sustained disturbance in gross movement, especially given his conclusion that McCoy's movement was "essentially intact." Only a month before McCoy's insured status expired, Dr. Puente noted that McCoy's Parkinson's was at a "pretty mild stage" and was "not affecting his activities of daily living to a significant degree." This kind of evidence does not compel a finding of disability under the listings, which are designed to identify claimants who–regardless of age, education, or work history–are incapable of performing "*any* gainful activity, not just 'substantial gainful activity.'" Zebley, 493 U.S. at 532. The ALJ's conclusion that McCoy did not meet this very high standard is supported by substantial evidence.

McCoy also argues that the ALJ erred by failing to develop the record on whether McCoy did, in fact, have a sustained disturbance in gross movement or gait and station. However, this argument mischaracterizes the ALJ's burden. While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. Conley v. Bowen, 781 F.2d 143, 146 (8th Cir.1986). Here there was voluminous evidence documenting the

-9-

effects of McCoy's Parkinson's disease and the ALJ's decision that McCoy had no sustained disturbance in gross movement or station and gait was supported by substantial evidence.

## B.     RFC Determination and Step Five

After finding that McCoy did not have a listing impairment, the ALJ went on to determine McCoy's RFC.  Relying in part on the testimony of a VE, the ALJ concluded that McCoy was capable of performing work available in the national economy.  McCoy argues the ALJ erred by failing to account for all of McCoy's limitations when determining McCoy's RFC and by determining that, given McCoy's RFC, he was capable of performing work in the national economy.  Specifically, McCoy alleges: (1) the ALJ erred by not finding him presumptively disabled under the medical-vocational guidelines contained in 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("the grids"); (2) the ALJ failed to consider some relevant evidence when determining McCoy's functional limitations and improperly discredited other evidence; and (3) the ALJ improperly relied on testimony from the VE about jobs that McCoy is not actually capable of doing. We reject each of these arguments.

First, McCoy argues that the ALJ should have found him presumptively disabled under the grids.  The grids are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  In this case, McCoy argues that the ALJ should have found him capable of only light work and, thus, given his demographic profile, should have found him conclusively disabled as of his 56th birthday. While McCoy is correct that if he were restricted to light work he would have been conclusively disabled as of his 56th birthday, he is incorrect to suggest that the ALJ erred by finding him capable of performing medium work.

The grids take into account only exertional limitations and certain demographic features; they do not account for non-exertional limitations. Reynolds v. Chater, 82 F.3d 254, 258-59 (8th Cir. 1996). McCoy's primary argument is he should have been placed in the light category because he is limited to occasional stooping, which renders him incapable of performing medium-level work. We reject this argument because–as we discuss below–the ALJ did not find that McCoy had a stooping limitation. Further, even if the ALJ had accepted McCoy's argument that he is limited to occasional stooping, a stooping limitation is a nonexertional limitation and, thus, is not part of the grids analysis. Lounsbury v. Barnhart, 468 F.3d 1111, 1115 (9th Cir. 2006). The ALJ correctly considered only exertional limitations when determining that McCoy was capable of medium-level work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) ("[W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone."). The only doctor to fill out a physical RFC evaluation about McCoy indicated that he was capable of lifting fifty pounds occasionally and up to twenty-five pounds frequently. This meets the exertional requirements for medium work. 20 C.F.R. § 416.967(c).[3] Thus, under the grids, there was no conclusive presumption of disability. Because McCoy also claimed nonexertional impairments, the correct procedure was to have a VE testify about the effect of McCoy's nonexertional limitations on his ability to

---

[3]McCoy argues that under the Social Security regulations, a limitation to stooping occasionally automatically undermines a claimant's ability to do the lifting required for medium work. While lifting strength and stooping posture may often be related, Social Security regulations treat them as factors that are to be examined separately. Here, the only physician who indicated McCoy had a stooping limitation also indicated he was capable of meeting all exertional requirements for medium work. McCoy's argument erroneously blurs the distinction between the role of exertional and nonexertional limitations in the disability analysis.

find jobs in the national economy, which the ALJ appropriately did here. See Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir. 1998).

Second, McCoy argues that, even if it was proper for the ALJ to move past the grids and consider VE testimony, the ALJ gave the VE an improper hypothetical that was based on a determination of McCoy's RFC that failed to account for all of McCoy's limitations because the ALJ ignored some evidence and improperly discredited other evidence. A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence. Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008). Here, the ALJ made a thorough and well-reasoned evaluation of the voluminous evidence related to McCoy's impairments. McCoy raises a number of objections to the ALJ's analysis, but none of them convince us that the ALJ's RFC determination was not supported by substantial evidence.

McCoy argues that the ALJ erred by discrediting McCoy's complaints of disabling pain and of physical impairments that limited his ability to walk, sit, stand, reach, handle, and stoop. However, the ALJ's decision not to fully credit McCoy's testimony on these matters was proper. In assessing a claimant's credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). If an ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). That is exactly what the ALJ did here; the ALJ identified and summarized McCoy's complaints, described evidence of his daily activities, identified inconsistencies between McCoy's testimony and record evidence, and considered the reports of both treating and consultative physicians.

Based on all of these factors, we believe the ALJ's conclusion that McCoy's self-reported symptoms were not "entirely credible" is supported by substantial evidence. "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). McCoy's complaints of disabling pain are inconsistent with repeated observations from treating and consultative physicians that McCoy was not in acute pain or distress. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (discrediting claimant's claim of disabling pain where, inter alia, claimant's treating physician repeatedly noted claimant "appeared to be in no significant distress."). Similarly, McCoy's reports that he gardened, drove, and helped his children get ready for school are inconsistent with his reports of disabling pain. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). Further, McCoy's testimony that he could walk only fifty feet because of acute pain was inconsistent with record evidence indicating that, as late as July 2006, McCoy told the doctor he was mowing the lawn in the high heat. The ALJ did not err by discrediting some of McCoy's reported symptoms.

McCoy also argues that the ALJ erred by failing to make explicit findings regarding McCoy's ability to stoop, stand, walk, handle, and reach. We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation. See Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) ("Here, however, the ALJ did not simply describe the RFC in 'general terms.' He made explicit findings and, although we would have preferred that he had made specific findings as to sitting, standing, and walking, we do not believe that he overlooked those functions."). Based on the administrative record here, we conclude that the ALJ did not overlook any of McCoy's alleged limitations. The ALJ identified the proper legal framework, noting she had to take into account all credible nonexertional limitations when determining McCoy's RFC. During the hearing and

in her written opinion, the ALJ considered evidence that was relevant to whether McCoy suffered from postural or manipulative limitations. Ultimately, the ALJ did not define McCoy's RFC in "general terms," but rather affirmatively made clear which of McCoy's alleged nonexertional limitations she found credible by including them in the hypothetical she gave to the VE. In this context, we conclude the ALJ implicitly made a finding that McCoy did not suffer from postural or manipulative limitations, and we "do not see any reason to remand to make [that finding] explicit." Depover, 349 F.3d at 568.

McCoy further argues that, even if the ALJ did make an implicit finding that McCoy had no stooping limitation, that finding was improper because it failed to account for medical evidence suggesting McCoy is limited to occasional stooping.[4] Specifically, McCoy contends that the finding fails to account for a physical RFC evaluation completed by agency physician A.R. Hohensee, M.D., in February of 2004, which indicated McCoy was limited to only occasional stooping, climbing, balancing, kneeling, crouching, and crawling. However, we conclude there were significant reasons for the ALJ to discredit this evaluation.

First, this 2004 evaluation of McCoy's postural limitations was: (1) given by a doctor who did not examine McCoy; (2) in a checklist format with no narrative discussion in the postural-limitation section; and (3) was not based on all relevant medical evidence. Each of these factors was a reason for the ALJ to discredit Dr. Hohensee's findings. "[T]he opinions of nonexamining sources are generally . . . given less weight than those of examining sources." Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (quotation omitted) (affirming decision to discredit

_____

[4]McCoy's arguments regarding the other alleged limitations rest almost exclusively on McCoy's own subjective complaints, which, as discussed above, the ALJ properly discredited because they were inconsistent with medical evidence and with McCoy's daily activities during his insured period. Thus, we conclude the ALJ's implicit rejection of those alleged limitations was supported by substantial evidence.

evaluation of agency psychologist who did not examine plaintiff). That is especially true when, like here, the nonexamining expert's opinion is given in checklist format. "[T]he checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). Relevant here, although Dr. Hohensee provided a narrative discussion on other parts of the evaluation, question seven in the postural-limitations section, which asked Dr. Hohensee to "explain how and why the evidence supports your conclusions in items 1 through 6. Cite the specific facts upon which your conclusions are based," was left completely blank. Finally, the opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation. See Wildman, 596 F.3d at 968. In this case, Dr. Hohensee did not have access to the records of Dr. Puente, which as discussed below, indicate that McCoy did not have significant postural limitations.

Second, Dr. Hohensee's finding that McCoy had a stooping limitation is inconsistent with the record as a whole. Although Dr. Hohensee did not indicate what evidence he was using to make his finding about postural limitations, at oral argument McCoy indicated it was based on objective medical evidence provided by Dr. Wang during a December 2003 consultative examination. McCoy emphasizes that Dr. Wang noted that McCoy's spinal cord flexion was only 90 degrees. However, at the same evaluation, Dr. Wang noted "cervical spine, flexion, extension, and lateral flexion all normal" that McCoy was "stable and balanced" and that he found no "neurological impairments." Thus, it is not clear that this is the medical evidence that supported Dr. Hohensee's finding of a stooping limitation. Further, in 2006, Dr. Puente–who regularly treated McCoy for several years–explicitly found he had "[n]o postural troubles." The ALJ correctly noted that, although McCoy regularly visited doctors during his insured period, he rarely mentioned any pain or limitation in movement of his back, and none of the doctors McCoy visited prior to 2006 reported treating McCoy for limitations imposed by back pain. Notably, in July 2006, three

months *after* McCoy's insured status expired, McCoy visited a new doctor at Family Physicians Group, complaining of "relatively new" and mild lower back pain, which the treatment notes indicate had only been going on a "few days." Similarly, in 2006, Dr. Puente noted that McCoy had not "focused on" his leg and back pain during their previous visits. McCoy is responsible for establishing a limitation that occurred before his insured status expired in March 2006. Thus, symptoms first reported and observed during these visits are unhelpful to McCoy. See Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007). Further, as the ALJ noted, the record indicates that during his insured period McCoy was engaging in day-to-day activities, such as gardening, that were inconsistent with McCoy's claimed limitations, including his stooping limitation. See Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005) (proper to consider evidence of daily activities when discounting physician's opinion of claimant's limitations). Thus, we conclude that the ALJ's implicit finding that McCoy had no stooping limitation was supported by substantial evidence.

McCoy also argues the ALJ erred by discrediting some of Dr. Puente's findings about McCoy. Specifically, McCoy argues the ALJ erred by discrediting parts of a mental RFC evaluation filled out by Dr. Puente in 2004 where he noted that McCoy had "marked" limitations in areas of understanding and memory as well as concentration and persistence. The ALJ explicitly referenced and discounted Dr. Puente's findings in this area. An ALJ may reject a treating physician's opinion if it is inconsistent with the record as a whole. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008). Here, the ALJ properly found Dr. Puente's mental RFC findings were inconsistent with the record as a whole. Dr. Puente's report was filled out before Dr. Stone performed objective testing at Dr. Puente's request. After conducting the cognitive testing, Dr. Stone produced a report suggesting that McCoy retained an average level in most areas of cognitive functioning and noting that the results of the test were "inconsistent with the presence of a significant memory or cognitive impairment." In 2007, Dr. Arias concluded that McCoy had only "moderate" memory impairments and that the rest of his cognitive performance was within or above

-16-

normal limits. Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible. For these reasons, we conclude that the ALJ's decision to partially discredit Dr. Puente's RFC was based on substantial evidence.

McCoy further argues that all of the above findings are nevertheless improper because the ALJ did not apply the proper legal standard. Namely, McCoy argues the ALJ failed to consider two critical elements: the sustainability of McCoy's ability to function and McCoy's ability to function in a real world work environment. McCoy is correct that an RFC determination must be based on a claimant's ability to "perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). Here, the ALJ recognized and applied this standard. The ALJ explicitly noted that McCoy's RFC should include only activities McCoy could do on a "sustained basis," and the opinion clearly contemplates the effect that a particular work environment would have on McCoy's ability to function, including limitations on the type of supervision, pace, required adaptability, and amount of public interaction that McCoy could handle. We conclude that, in determining McCoy's RFC, the ALJ properly engaged in a "realistic evaluation of his abilities to work." Juszczyk, 542 F.3d at 633.

Finally, McCoy argues that the ALJ improperly relied on incorrect VE testimony about the jobs McCoy would be capable of performing. Specifically McCoy argues that the VE testified that McCoy could perform jobs, as a building cleaner and as a laborer, which are inconsistent with McCoy's limitation to occasional fingering. However, some of the jobs in these categories that the VE referenced require either no fingering or only occasional fingering. See, e.g., Dictionary of Occupational Titles § 411.687-018 (poultry farm laborer); § 381.687-018 (industrial cleaner) (4th ed. 1991). The VE did not suggest McCoy would be able to perform

each and every job in the categories he mentioned, nor was he required to identify a category in which McCoy could perform all of the jobs. Thus, McCoy has not undermined the evidentiary value of the VE's testimony by identifying some jobs in those categories that require more-than-occasional fingering. McCoy's argument that he cannot do *any* of the jobs in those categories is based on his assumption of other limitations (i.e., stooping limitations), which the ALJ properly did not find credible and which, therefore, cannot be used to undermine the VE's analysis. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). Because the VE was presented with a proper hypothetical, his testimony that there were jobs in the national economy that McCoy could perform constituted substantial evidence. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004).

## III. CONCLUSION

For the foregoing reasons, we affirm.

_____