# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1521

_____

Wilhemenia Wildman,

        Appellant,

v.

Michael J. Astrue, Commissioner
of Social Security,

        Appellee.

\* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the Southern
District of Iowa.

_____

Submitted: December 16, 2009
Filed: March 8, 2010

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Wilhemenia Wildman appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 et. seq., and supplemental security income benefits ("SSI") under Title XVI of that same Act, id. §§ 1381 et. seq. An administrative law judge ("ALJ") upheld the Commissioner's decision and the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Wildman then appealed to the

district court,[1] which affirmed the Commissioner's decision. Wildman now appeals, and we affirm because the Commissioner's decision is supported by substantial evidence.

## I. BACKGROUND

Wilhemenia Wildman was born on January 9, 1960, attended high school through the ninth grade, and later earned her general equivalency diploma ("GED"). She has a sporadic work history that includes jobs as a janitor, hand packager, salvager (can sorter), and cleaning supervisor. Wildman admits that she has a long history of drug and alcohol abuse that likely contributed to her current liver problems and depression. In 2004, Wildman protectively filed applications for DIB and SSI, claiming she became disabled on September 20, 2002. The Commissioner denied her applications initially and on reconsideration, and the ALJ affirmed that denial. The ALJ first determined that Wildman met the insured status requirements for entitlement to DIB through December 31, 2007. Then, he held that Wildman's impairments included: a history of multiple surgeries on the right shoulder; fatty liver disease with steatohepatitis and fibrosis; pancreatitis; diabetes mellitus; an abdominal hernia; allegations of medically determinable impairments resulting in complaints of pain in the back, leg and left shoulder; dysthymia; major depression; and polysubstance abuse.

Following the regulatory five-step disability analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ concluded at step one that Wildman had not engaged in "substantial gainful activity" since September 20, 2002–her alleged disability onset date. Then, at steps two and three, the ALJ determined that while Wildman's impairments were "severe," they did not reach the level of severity contemplated in

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1. Finally, at step four, the ALJ determined that Wildman had the following residual functional capacity ("RFC"):

> She can lift 20 pounds maximum occasionally and 10 pounds frequently and stand/walk and sit six hours in an eight hour day. She can occasionally bend, stoop, squat, kneel, crawl and climb. She can occasionally work with the right arm above shoulder level. She is able to do at least simple, routine, repetitive work not requiring constant close attention to detail or use of independent judgment. She needs occasional supervision and can work at a regular pace. She should not perform high stress work.

Based on this RFC, a vocational expert testified that Wildman could return to her past relevant work as a salvager/can sorter. Accordingly, the ALJ determined at step four that Wildman was not disabled at any time through the date of his decision and denied Wildman's applications for DIB and SSI.

On appeal, Wildman argues that the ALJ erred in failing to include all of her impairments in the RFC assessment and in the hypothetical provided to the vocational expert. Specifically, Wildman argues that if the ALJ had properly weighed (1) the opinions of treating, examining, and nonexamining medical professionals, and (2) Wildman's credibility, the ALJ's RFC would have included pace and attendance limitations.

## II.    DISCUSSION

We review a district court's decision to affirm the denial of social security benefits de novo. Brown v. Barnhart, 390 F.3d 535, 538 (8th Cir. 2004). In doing so, "we determine whether the ALJ's decision to deny benefits is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a

whole."  Id. (internal quotation omitted).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision.  Id.  If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.  Id.

## A.    Medical Opinions

### 1.    Dr. Burstain's Opinion

On June 16, 2006, Dr. Todd Burstain, Wildman's treating physician, completed several forms describing Wildman's physical ailments and work-related physical limitations.  On the forms, Dr. Burstain noted that Wildman suffered from liver disease, chronic alcoholic pancreatitis, and flares of acute pancreatitis that occur "about monthly."  As for Wildman's work-related physical limitations, Dr. Burstain concluded that Wildman could only work one hour per day, sit a total of one hour per workday, stand a total of one hour per workday, lift ten pounds occasionally, and lift five pounds frequently.  The ALJ gave "little weight" to this opinion, emphasizing, among other reasons, that the opinion was conclusory and did not take Wildman's noncompliance into consideration.

Wildman argues that the ALJ erroneously discounted Dr. Burstain's opinion. We disagree.  "Generally, [a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Brown, 390 F.3d at 540 (alteration in original) (internal quotation omitted). However, "[a]n ALJ may discount or even disregard the opinion of a treating

physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted).

First, the ALJ properly discounted Dr. Burstain's opinion because it was conclusory. The opinion consists of three checklist forms, cites no medical evidence, and provides little to no elaboration. "The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). Indeed, "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements." Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

Furthermore, the ALJ properly discounted Dr. Burstain's opinion because it did not take Wildman's noncompliance into account. "[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight." Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008). While our review of the record confirms that Wildman suffered from abdominal pain flares "about monthly," a closer look at Dr. Burstain's notes reveals that a vast majority of such flares were precipitated by Wildman's failure to comply with her prescribed diet and medications, and her failure to totally abstain from drugs and alcohol.

First, Wildman failed to completely abstain from drugs and alcohol. On November 6, 2002, Wildman sought treatment in the emergency room for abdominal pain. The physician on duty attributed Wildman's pain to pancreatitis and instructed her to "stop alcohol consumption." Yet, Dr. Burstain's treatment notes reveal that Wildman subsequently suffered from abdominal pain flares after drinking alcohol in 2003 and using three lines of cocaine at a party in 2005.

Wildman also failed to take her medications as prescribed. On June 29, 2005, Dr. Burstain noted that Wildman was suffering from another pancreatitis flare. When Dr. Burstain questioned Wildman about whether she had been taking her Creon,[2] Wildman "said yes, but now says that she has actually not been using that." Dr. Burstain concluded that Wildman's chronic pancreatitis "is worse right now, probably secondary to noncompliance of the Creon. I have emphasized the importance of going back on that." On July 7, 2005, Dr. Burstain noted that Wildman "still has not filled" her Creon prescription and he "again encouraged her to get the Creon filled."

Finally, Wildman repeatedly failed to follow her prescribed diet. On February 27, 2004, Wildman reported to Dr. Burstain with a pancreatitis flare and Dr. Burstain instructed her to "limit her diet to simple starches." The following week, Wildman told Dr. Burstain that she thought the pancreatitis flare "may have been triggered by eating a McDonald's hamburger" and that she was able to simplify her diet, take her medications, and "resolve her symptoms." However, despite Dr. Burstain's repeated admonitions, Wildman suffered from numerous subsequent abdominal pain flares after failing to comply with her diet. Specifically, Dr. Burstain's treatment notes reveal that Wildman had abdominal pain exacerbations and flares after she: (1) ate pork (January 8, 2005); (2) ate two Krispy Kreme doughnuts (February 7, 2005); (3) ate "fairly high fat meat meals" (March 29, 2005); (4) had "not been eating or following the diet as ha[d] been recommended" (April 29, 2005); (5) had "not been following her diet" (May 27, 2005); (6) ate "a large meal during which she had a steak and a burger" (August 2, 2005); (7) ate a McDonald's hamburger (September 26, 2005); and (8) had "not been watching her sugars" (February 24, 2006).

_____

[2]Creon "is a prescription pancreatic enzyme medicine used to improve food digestion in people who cannot digest food properly because they have exocrine pancreatic insufficiency." Physician's Desk Reference 3306 (64th ed. 2010).

Importantly, Dr. Burstain's notes also indicate that when Wildman was compliant, her abdominal pain was generally "under fairly good control."[3] In fact, during one such period of compliance, Wildman told Dr. Burstain that she was going to try to go back to work. On another similar occasion, Wildman reported to Dr. Burstain that she injured her shoulders while "doing some work recently." "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown, 390 F.3d at 540 (quotations omitted).

Wildman argues that her noncompliance is justified because it is a symptom of her mental problems–i.e., her depression and alleged concentration and memory limitations. Specifically, Wildman argues that her mental limitations prevent her from remembering and following directions and that she therefore cannot comply with doctors' instructions. To support this argument, she relies on our recent decision in Pate-Fires v. Astrue, 564 F.3d 935 (8th Cir. 2009). In Pate-Fires, the claimant suffered from severe schizoaffective disorder that caused the claimant's manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and complete denial of her illness. Id. at 946. Although there was overwhelming evidence in the record expressly indicating that the claimant's severe mental disorder caused her noncompliance with psychiatric medication, the ALJ held that such noncompliance was not justified. Id. We reversed, concluding that the ALJ's decision failed to recognize that the claimant's noncompliance was a manifestation of her schizoaffective disorder and that noncompliance with psychiatric medication is common among persons with such disorders. Id. at 945.

---

[3]Wildman can point to a few instances in which she suffered from pancreatitis flares despite apparently eating a simple diet, taking her medications, and totally abstaining from alcohol and drugs. These few instances do not support a conclusion that Wildman would suffer from monthly abdominal pain flares despite compliance. Moreover, we find that there is substantial evidence in the record as a whole to support the ALJ's conclusion that Wildman's abdominal pain flares are under fairly good control when Wildman is compliant.

Pate-Fires is distinguishable from the present case in several ways. Wildman suffers from depression, not schizoaffective disorder, and Wildman's noncompliance consisted mostly of failing to follow her prescribed *diet*, not failing to take her *psychiatric medication*. Moreover, unlike in Pate-Fires, there is little or no evidence expressly linking Wildman's mental limitations to such repeated noncompliance. In fact, there is conflicting evidence in the record regarding the severity of Wildman's alleged memory and concentration impairments. While two examining psychologists noted that Wildman had concentration and memory limitations, an examining neurologist concluded that Wildman's memory and concentration were "normal." Accordingly, Pate-Fires is inapposite and Wildman's noncompliance is not justified.

Thus, the ALJ did not err in discounting Dr. Burstain's opinion because it was conclusory and failed to account for Wildman's unjustified noncompliance. Since these reasons are sufficient to support the ALJ's decision to discount the opinion, we need not discuss the ALJ's other reasons for doing so. Goff, 421 F.3d at 790-91.

### 2. Dr. Michaelson's Opinion

Between January 2005 and January 2006, Wildman visited a psychiatrist, Dr. Richard Michaelson, three times. During each visit, Dr. Michaelson conducted a mental status exam and recommended changes in Wildman's medications to Dr. Burstain. On Wildman's first visit, Dr. Michaelson also noted Wildman's history of liver and pancreatitis problems and explained that "[Wildman] at this point is markedly limited by her multiple medical problems but there are a couple of things that could be considered." Dr. Michaelson then recommended changes in her depression medication to prevent increased blood sugar and hypertension. While the ALJ cited Dr. Michaelson's notations regarding Wildman's mental status in his decision, he did not specifically discuss Dr. Michaelson's statement that Wildman was "markedly limited" by her medical problems. Wildman argues that the ALJ erroneously "ignored" Dr. Michaelson's reports. We disagree.

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id. Given the ALJ's specific references to findings set forth in Dr. Michaelson's notes, we find it "highly unlikely that the ALJ did not consider and reject" Dr. Michaelson's statement that Wildman was markedly limited. Id.

### 3.      Drs. Marchman's and Kikendall's Opinions

On July 22, 2003, Dr. James Marchman, a consulting psychologist, examined Wildman and concluded that she was "not capable of working." Specifically, Dr. Marchman explained that Wildman's "chronic depression contributes to her difficulties but it is secondary to physical problems in terms of impairing her functioning." He also noted that Wildman had "somewhat impaired concentration and short-term memory" and was limited in "maintaining a proper pace." On June 14, 2004, Dr. Marchman's associate, Dr. Kathleen Kikendall, examined Wildman. Dr. Kikendall concluded that Wildman "would have a great deal of difficulty performing even minimally in a work environment." She concluded that Wildman was "in what might be the final stages of liver disease," had difficulty following instructions, and had memory limitations. The ALJ disregarded both psychologists' opinions because they were based largely on Wildman's statements and subjective physical complaints. He also emphasized that analyzing Wildman's physical impairments was beyond their expertise as psychologists.

Wildman argues that the ALJ erroneously disregarded the opinions of Drs. Marchman and Kikendall. We disagree. After reviewing the opinions, we agree that the psychologists largely based their determination that Wildman could not work on their analysis of Wildman's physical ailments. Since this is indeed beyond their expertise as psychologists, the ALJ did not err when he disregarded their opinions for

this reason.  See  Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir. 2003) (holding that an ALJ properly discounted consulting psychologist's opinion because it was based partly on consideration of physical impairments, an area outside the psychologist's expertise).  Moreover, the ALJ did not err when he discounted their opinions because they were based largely on Wildman's subjective complaints.  See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to discount an opinion where the opinion was based largely on the claimant's subjective complaints rather than on objective medical evidence).

### 4.     State Agency Opinions

Finally, Wildman argues that the ALJ erred when he disregarded state agency psychologists' opinions.  In 2003 and 2004, nonexamining state agency psychologists concluded that Wildman had "moderate" limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  One of the psychologists elaborated that Wildman's "treatment history is suggestive of periodic moderate interference in her ability to regularly complete a typical work week."  The ALJ disregarded these and other state agency opinions because they did not have access to all of the medical evidence in the record.

First, we note that "the opinions of nonexamining sources are generally . . . given less weight than those of examining sources."  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008); see 20 C.F.R. § 404.1527(d)(1).  The regulations also provide that, when evaluating a nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources."  20 C.F.R. § 404.1527(d)(3); see also id. § 404.1527(f) (discussing rules for evaluating nonexamining state agency opinions).  Here, we find it significant that the state agency evaluators did not have access to medical records from 2005 and 2006–most

notably Dr. Burstain's treatment notes from that period that document Wildman's repeated noncompliance. The state agency doctors also did not have the opportunity to review Dr. Michaelson's mental status exams.

Moreover, we are not convinced that there would have been a different outcome in this case if the ALJ had given more weight to the state agency opinions. First, the psychologists' reports contain statements that raise concerns about Wildman's credibility and seriously question the conclusions of Drs. Marchman and Kikendall. They also concluded that Wildman was "[n]ot significantly limited" in her ability to "maintain regular attendance," and one report states that Wildman's "[c]oncentration and memory were broadly intact." Moreover, nonexamining state agency physicians determined that Wildman could lift twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour workday, and stand six hours in an eight-hour workday. The physicians also questioned the credibility of Wildman's subjective complaints. Indeed, one physician went so far as to state that "[t]he evidence in file was inconsistent with all the allegations."

Accordingly, we do not think the ALJ erred when he disregarded the state agency opinions.

## B. Wildman's Credibility

Wildman testified before the ALJ that she suffers from various ailments including depression, shoulder pain, liver problems, and monthly pancreatitis flares that keep her off her feet for up to a week at a time. She claimed that due to her ailments, she could only walk less than a block, stand thirty minutes before resting, sit for an hour, and lift a gallon of milk. However, after considering and weighing the medical evidence in the record, the ALJ concluded that Wildman's allegations regarding her limitations were "not fully credible." To support this determination, the ALJ emphasized Wildman's noncompliance with her prescribed diet and medications,

her failure to totally abstain from drugs and alcohol, and her sporadic work history prior to her alleged onset date. Although Wildman does not challenge the ALJ's determination that she has a sporadic work history, she argues that the ALJ erred when he discounted Wildman's testimony regarding her limitations due to her noncompliance. We disagree.

"In analyzing a claimant's subjective complaints, such as pain, an ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Other factors also include the claimant's "relevant work history and the absence of objective medical evidence to support the complaints." Id. (quotation omitted). The above factors are derived from our decision in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While ALJs must acknowledge and consider these so-called Polaski factors before discounting a claimant's subjective complaints, we have held that ALJs "need not explicitly discuss each Polaski factor." Goff, 421 F.3d at 791 (quotation omitted). ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole, and "[w]e will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted).

Here, the ALJ properly cited and considered the Polaski factors, and explicitly discredited Wildman's credibility. Moreover, substantial evidence in the record as a whole supports the ALJ's determinations that Wildman had a sporadic work history before her disability onset date and that Wildman was noncompliant with her doctor's instructions to take her medications, follow her diet, and totally abstain from drugs and alcohol. These are valid reasons for discrediting Wildman's subjective complaints. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008). Therefore,

we defer to the ALJ's adverse credibility determination because it is supported by substantial evidence.

## C.    RFC Assessment

Finally, Wildman argues that the ALJ's RFC assessment must be reversed because it is not supported by any medical evidence.  ALJs bear "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  That said, a claimant's RFC is a medical question and "at least some" medical evidence must support the ALJ's RFC determination.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Accordingly, "the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (internal quotation omitted).

As discussed above, the ALJ properly considered and weighed the available medical evidence and Wildman's testimony.  Wildman's argument that the ALJ's RFC is not supported by any medical evidence is unfounded.  On September 3, 2003, Dr. R. Tyson Garrett, an examining neurologist, concluded that Wildman's judgment, insight, concentration, attention span and memory were "normal."  After conducting a physical exam, he also concluded that Wildman could lift up to twenty pounds, stand, move, walk, and "sit an 8 hour work day."  Finally, Dr. Garrett explained that, aside from the twenty-pound lifting limit, he saw no "limitations for her arm from this rotator cuff."[4]  Along with Dr. Garrett's opinion, the ALJ also considered Dr.

---

[4]Wildman argues that the ALJ erred when he gave greater weight to Dr. Garrett's opinion than to Dr. Burstain's June 16, 2006, opinion.  "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions."  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (quotation omitted).  Generally, Dr. Burstain's opinion as a treating physician would be given more weight than the opinion of Dr. Garrett, a one-time consulting neurologist.  Id.  However, that is not the case where, as here, the consulting

Burstain's treatment notes, Dr. Michaelson's mental status exams, and conducted an independent review of the medical evidence to formulate his RFC. Still, Wildman argues that the ALJ should have included pace and attendance limitations in his RFC. However, Wildman fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). Moreover, the ALJ was not obligated to include limitations from opinions he properly disregarded. See Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

We conclude that the ALJ's RFC–which is based on the ALJ's independent review of the medical record, Dr. Burstain's treatment notes, Dr. Garrett's opinion, Wildman's sporadic work history and apparent lack of motivation, and Wildman's repeated and unjustified noncompliance–is supported by substantial evidence. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002). Based on the ALJ's RFC assessment, a vocational expert testified that Wildman could perform her past relevant work as a salvager/can sorter. Based on that testimony, the ALJ found that Wildman could perform her past relevant work. Accordingly, we find that substantial evidence supports the Commissioner's decision to deny Wildman's applications for SSI and DIB because she is not disabled.

## III.   CONCLUSION

The judgment of the district court is affirmed.

_____

---

physician's opinion is supported by "better or more thorough medical evidence." Id. As discussed above, Dr. Burstain's opinion was conclusory and failed to account for Wildman's noncompliance. In contrast, Dr. Garrett conducted a physical exam of Wildman, documented his findings in detail, and cited medical evidence to support his conclusions regarding Wildman's limitations. Therefore, the ALJ did not err when he credited Dr. Garrett's opinion over Dr. Burstain's opinion.