ROBERT W. PRATT, U.S. DISTRICT JUDGE
Plaintiff, Colleen Marie Terry, filed a Complaint in this Court on November 7, 2017, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).
Plaintiff filed an application for benefits on September 3, 2014. Tr. at 191-94. Plaintiff was fifty two years old (Tr. at 47) at the time of the hearing on August 29, 2016, before Administrative Law Judge Susan Zapf (ALJ). Tr. at 41-84. The ALJ issued a Notice of Decision - Unfavorable on November 2, 2016. Tr. at 17-36. On September 13, 2017, the Appeals Council declined to review the ALJ's decision. Thereafter, Plaintiff commenced this action.
At the first step of the sequential evaluation, see 20 C.F.R. § 404.1520(a)(4), the ALJ found that Plaintiff had not engaged in substantial gainful activity after April 30, 2014-the alleged disability onset date. Tr. at 22. At the second step, the ALJ found that Plaintiff has the following severe impairments: osteoarthritis, degenerative disc disease, migraine headaches, borderline intellectual functioning, a learning disorder, an affective disorder, and an anxiety disorder. The ALJ considered other impairments which were not determined to be severe as defined by the regulations. Those non-severe impairment were: hypothyroidism, acid reflux, appendicitis, asthma, cough, acute sinusitis, bronchitis, upper respiratory infection, mild asthma, skin infection, pain in the rib cage, planter fasciitis of the right foot. The ALJ found that the symptoms of these impairments either resolved or became asymptomatic with nominal conservative treatment. Although Plaintiff alleged disability due to bilateral hearing impairment, the ALJ found that the medical evidence does not document diagnostic testing to confirm hearing loss, nor significant or ongoing treatment for a hearing disorder. Plaintiff had been evaluated for heart palpitations, but the ALJ noted that the condition improved with medication, and treatment notes suggested that the heart palpitation might be related to anxiety. Tr. at 23. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 24. At the fourth step, the ALJ found:
After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except she *943 can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. To account for momentary deficits in concentration and attention, she is limited to simple, routine, repetitive tasks that can be easily resumed without having to recreate the entire task. The claimant is also limited to occasional interaction with co-workers and supervisors, but cannot interact with the public. In addition, she cannot perform tandem tasks; can have no more that occasional changes in work processes and procedures; and cannot be exposed to loud factory level noise or bright focused lighting, such as a spot light.
Tr. at 25. The ALJ found that Plaintiff is able to perform her past relevant work as a laundry worker I. Tr. at 33. Although the ALJ stopped the sequential evaluation at the fourth step, she also noted that other work exists in significant numbers which could be performed by someone of Plaintiff's age, education, past relevant work and residual functional capacity. Tr. at 34-35. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 36.
MEDICAL EVIDENCE
On February 27, 2013, Plaintiff saw Jennifer A. Meyer, A.R.N.P., with complaints of sinusitis and left lower ribcage pain. Tr. at 355-57. Chest x-rays were noted to be negative. Tr. at 358. Plaintiff saw Nurse Meyer for primary care on several occasions throughout the period of time under consideration. See, Tr. at 344-57, 341-43, 337-40, 403-06, 458-60, and 456-57.
On November 8, 2013, Plaintiff was seen by Dwayne N. Campbell, M.D., at the University of Iowa Hospitals and Clinics. Plaintiff was noted to have a history of palpitations which had been treated with medication - metoprolol - which significantly improved the symptoms. Tr. at 331.
On May 29, 2014, Plaintiff saw Barbara Brown, M.D. to establish care for ADHD (Attention Deficit Hyperactive Disorder), possible learning disorder, and symptoms of depression and anxiety. Plaintiff reported that, at age 5, her mother was institutionalized because of mental illness, she and her siblings were placed in an orphanage. She was later placed in a foster family with people who were emotionally cold. Plaintiff reported a history of being treated for depression with medication. Plaintiff reported a history of job loss because of her inability to pay attention and focus. Tr. at 374. Plaintiff reported earning "Bs" in her high school classes, and later completing three years of college. After a mental status examination, Dr. Brown diagnosed, on Axis I[1] , ADHD combined type, consider learning disabilities of uncertain type, major depressive disorder, generalized anxiety disorder, and panic disorder. On Axis II, Dr. Brown noted some schizotypal personality traits[2] , especially paranoia. On *944 Axis V[3] , Plaintiff's global assessment of functioning was rated at 50. Plaintiff was currently taking Lexapro, the dosage of which Dr. Brown increased. The doctor also prescribed Zolpidem, and Wellbutrin XL. The doctor noted that a psychological evaluation would be arranged to test for ADHD, because, the doctor speculated, if Plaintiff had ADHD, which could not be treated with medication because of a heart condition, she might qualify for disability benefits which would relieve financial stress. Tr. at 375.
On June 15, 2014, Plaintiff was seen for a psychological evaluation by Catharine Phillips, Ph.D. Tr. at 366-69. Plaintiff reported a difficult childhood. Although Plaintiff reported significant difficulties with school work, she reported that she completed three years of college. Regarding work history, Dr. Phillips wrote:
Since her 20's Ms. Terry reports that she has experienced significant difficulty sustaining employment. She reports that she worked in 35-40 different positions in factories, restaurants including fast food, housekeeping and nursing homes. In all her employment settings she describes "difficulty keeping up." Most recently she was let go by a nursing home where she had been employed for nearly 2-years as a dietary aide and cook after her supervisor reported that she was "too stressed out, overwhelmed and slow" in her job.
Plaintiff's medication was Wellbutrin, Lexapro, and Ambien. Tr. at 366. After the administration of various psychological tests (Tr. at 367-68), Dr. Phillips diagnosed generalized anxiety disorder, recurrent major depressive disorder, and learning disorder NOS (slow processing skills). It was also noted that Plaintiff demonstrated borderline range intellectual functioning (but the doctor noted that Plaintiff's "current IQ may be reflective of mood/concentration/persistence difficulties she is experiencing as well as long time difficulties with processing skills." Tr. at 368). Dr. Phillips recommended that Plaintiff continue her treatment with Dr. Brown, and that after Plaintiff's mood was stabilized that she seek vocational rehabilitation services to explore job training or job placement assistance. Tr. at 369.
On June 19, 2014, Plaintiff saw Dr. Brown. The doctor noted Dr. Phillips' opinion that Plaintiff has a significant learning disability, but does not have classic ADHD. The doctor wrote that she would consult with Plaintiff's cardiologist regarding treatment. The doctor wrote: "I have also discussed going to Vocational Rehab. I think that Ms. Terry may not really be able to hold a job in the community and may need to seek disability." Tr. at 373.
In a treatment note dated August 19, 2014, Dr. Brown encouraged Plaintiff to seek services from Vocational Rehabilitation, and if she is unable to work, to apply for disability benefits. Tr. at 379.
On September 17, 2014, Plaintiff saw Thomas Riester, PT, DPT, on referral from Nurse Meyer. Tr. at 392-95. Plaintiff's chief complaint was low back pain *945 which radiated to the left hip. The therapist's assessment was lumbar pain and decreased range of motion secondary to degenerative disc disease. Tr. at 394. Plaintiff saw Mr. Riester again on September 19 (Tr. at 390-91), September 24, (Tr. at 388-89), September 26 (Tr. at 386-87), September 29 (Tr. at 384-85), and October 1, 2014 (Tr. at 382-83).
On September 30, 2014, Plaintiff saw Dr. Brown. Plaintiff reported that she decided not to go to Vocational Rehabilitation, but to instead file for disability because of her back pain. The doctor told Plaintiff that she would cooperate with Plaintiff's lawyer to provide the needed information, and the doctor opined that Plaintiff "deserves disability." Tr. at 378.
An MRI of Plaintiff's thoracic spine dated October 16, 2014 did not reveal any abnormalities. Tr. at 407. A scan of Plaintiff's low back showed: "Mild degenerative disc disease and facet arthropathy in the lumbar spine without significant canal or foraminal stenosis." Tr. at 408.
On October 21, 2014, Jonathan Brandon, Ph.D., a State agency psychological consultant, reviewed Plaintiff's claim and determined that medically determinable impairments (MDIs) included organic mental disorders, affective disorders, anxiety related disorders, and personality disorders. Dr. Brandon determined that Plaintiff's impairments do not meet or medically equal any of the listed impairments. Tr. at 98. Dr. Brandon concluded his evaluation of the evidence by writing:
The evidence supports the MDIs of Major Depressive Disorder, Generalized Anxiety Disorder, Panic Disorder, Schizotypal Personality Traits, Borderline Intellectual Functioning, and Learning Disability NOS. The claimant does experience limitations to her functioning, particularly with regard to her processing speed and ability to attend and concentrate, and therefore her allegations are generally credible. Listings 12.02, 12.04, 12.06, and 12.08 were referenced in evaluating this claim. The claimant's MDIs, while severe, do not meet or equal a listing. The claimant engages in a relatively wide range of [activities of daily living], and she has no recorded episodes of decompensation. Based on her history of difficult social interactions, she is fearful of others and her slow processing speed may be a distraction to others. She will experience some difficulty understanding, remembering, and carrying out detailed instructions. She will experience some interruption to her ability to keep pace from her psychologically-based symptoms, and she will have some difficulty with maintaining concentration for extended periods. However, the claimant retains the capacity to perform simple, repetitive tasks consisting of 1 to 2 step commands in a work environment with reduced social interaction.
Tr. at 104.
On October 21, 2014, Laura Griffith, D.O., a State agency medical consultant, reviewed Plaintiff's claim and determined that Plaintiff retains the residual functional capacity to lift and carry 50 pounds occasionally, and 25 pounds frequently. Tr. at 100. Dr. Griffith noted a paucity of objective findings to support any of Plaintiff's physical complaints. The doctor noted that Plaintiff had complained of hearing loss, but that there was no medical evidence to support such complaints. Although the doctor noted migraine headaches, the doctor found very little care and no emergency department visits for headaches. Tr. at 101.
On October 29, 2014, Dr. Brown wrote a letter to Plaintiff's attorney and completed some "check the box" residual functional capacity forms. Tr. at 397-400. Dr. Brown *946 noted that Plaintiff's diagnoses are: major depressive disorder, recurrent, severe[4] ; generalized anxiety disorder ; learning disability not otherwise specified; and, borderline intellectual functioning. Although Plaintiff's history included a diagnosis of Attention Deficit Hyperactive Disorder, the doctor noted that the recent psychological testing had ruled out that diagnosis. The doctor wrote: "It is very difficult for her to remember instructions and complete assigned tasks. It is difficult for her to interact socially with peers and supervisors. While antidepressants may help her with symptoms of depression and anxiety, there are no medications or therapies that would be helpful for her mental deficits." The doctor opined that disability is appropriate for Plaintiff. Tr. at 397. The residual functional capacity forms asked the doctor to rate Plaintiff abilities in several domains on a scale of "unlimited or very good," "limited but satisfactory," "seriously limited but not precluded," "unable to meet competitive standards," and "no useful ability to function." "Seriously limited but not precluded was defined as "... ability to function in this area is seriously limited and less than satisfactory, but not precluded." Unable to meet competitive standards was defined as "... your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." No useful ability to function was defined as "... an extreme limitation, means your patient cannot perform this activity in a regular work setting." None of the domains were marked "unlimited or very good." One domain was marked "limited but satisfactory" - Adhere to basic standards of neatness and cleanliness. The remainder of the domains were marked "seriously limited but not precluded," "unable to meet competitive standards," and "No useful ability to function." The doctor opined that if Plaintiff was working, she would be absent from work more than four days per month. Tr. at 400.
On March 3, 2015, John May, M.D., a State agency medical consultant, reviewed Plaintiff's claim at the reconsideration stage and affirmed the findings made by Dr. Griffith. Tr. at 119.
On March 11, 2015, Scott Shaffer, Ph.D., a State agency psychological consultant, reviewed Plaintiff's claim at the reconsideration stage. Dr. Shafer wrote that Dr. Brown's opinion of Plaintiff's mental residual function capacity was inconsistent with other evidence in the record - medical records, psychological assessment, employment history, and activities of daily living. Dr. Shaffer opined that Dr. Brandon's previous assessment should be affirmed. Tr. at 122.
On April 30, 2015, Plaintiff saw Dr. Brown. The doctor wrote:
Ms. Terry hasn't been to see me since September of last year. In that time, she tells me she has been breaking her Lexapro and WBT in half to make them last. She applied for disability but was turned down. She appealed and was turned down again. Her case is supposed to go before a judge but she doesn't know exactly when. She went to Voc Rehab but they had a long waiting list. She decided to try to get a job on her own. She got a job at Casey's but quit after 2 months. She says, "there were too many customers, it was overwhelming." Some of the other workers *947 there did not pull their weight and that was more work for her to do. Sometimes people would ask her what was wrong with her or if she has dyslexia. She could not work the cash register correctly, etc. She called in and quit. She says her lawyer is upset with her because she hurt her chances for disability by getting the job. She also says that when she is very anxious she sometimes has a tremor. She tells me it is not there all the time. It has been going on for the past three months.
The doctor noted a mild tremor in both upper extremities that appeared to be constant. Tr. At 413. On July 29, 2015, Plaintiff saw Dr. Brown. On this occasion the doctor noted that no tics or tremors were seen. Tr. at 411.
On August 15, 2015, Plaintiff was seen at the University of Iowa Hospitals and Clinics complaining of abdominal pain which was determined to be caused by acute appendicitis. Plaintiff underwent a laparoscopic appendectomy and was discharged home the following day. Tr. at 419-37. On discharge Plaintiff was advised to limit her physical activity for two weeks. Tr. at 422.
On September 3, 2015, Plaintiff returned to the University of Iowa Hospitals and Clinics complaining of nausea - without vomiting, and diarrhea. On examination, no abnormalities were found. Tr. at 438-43.
On November 13, 2015, Plaintiff was seen at the emergency department of the University of Iowa Hospitals and Clinics. Plaintiff complained of, and was treated for, a migraine headache. Tr. at 445-48.
On March 22, 2016, Plaintiff saw Peggy D. Creamer, ARNP with complaints of an upper respiratory infection. Tr. at 469-70. On April 5, 2016, Plaintiff saw Nurse Creamer again to establish care at Unity Point Health in Muscatine, Iowa. Tr. at 471-76. Nurse Creamer noted several medical problems: 1) generalized anxiety disorder for which medication was prescribed, and a referral to psychiatry was made; 2) irregular heart beat; 3) gastroesophageal reflux disease ; 4) depression; 5) plantar fasciitis of the right foot; 6) mild persistent asthma with acute exacerbation; 7) migraine without aura and without status migrainosus, not intractable; 8) degenerative disc disease, lumbosacral; 9) allergic rhinitis ; 10) other chronic nonsuppurative otitis media of the left ear. Plaintiff was also referred for a gynecologic examination and a well adult exam. Tr. at 474-75. On May 20, 2016, Plaintiff saw Nurse Creamer with complaints of an upper respiratory infection. Tr. at 476-77.
On September 1, 2016, Plaintiff saw Dieter Boxmann, PMHNP (psychiatric mental health nurse practitioner). Tr. at 465-68. Diagnoses on Axis I were social anxiety disorder and major depressive disorder, recurrent, severe. On Axis II diagnoses were history of learning disorder not otherwise specified, and borderline intellectual functioning. Nurse Boxmann renewed Plaintiff's medication and added Trazadone. Tr. at 467.
ADMINISTRATIVE HEARING
The ALJ asked Plaintiff why she felt she is unable to work, to which Plaintiff responded:
Well, first of all, I get very - I have anxiety attacks. I get really overwhelmed. I don't understand a lot of stuff that - when I'm supposed to do it, I don't seem to do it right, and people get very angry at me and upset with me. And so I get frustrated, and I feel like I have a breakdown. Sometimes I just - I have outbursts, but - and then I miss work because I have very bad migraine headaches that I take nine pills a month - I get nine pills a month, and I usually use them up. And when I get *948 these bad headaches, I have to stay in bed, and my medicine also - all my medicines I take make me sleepy, and I throw up really bad when I get them. I get -- sometimes get dehydrated from it, but - now I take, like, a nausea medicine, over the counter, to help me with the throwing up. But it - sometimes I get them three, four days in a row - these migraines, and then I'll go a week or two without them, then I'll get them back again. And so I have to - I can't be around light because that makes it worse, and then I have to lay down and sleep or put, like - what I do is I put a heat pad - rotate between a heat pad and a ice pack, and I lay in bed and I try to do, like, pressure points myself. I try anything, everything I can. I take Imitrex, and it takes two to three hours for that to work, and then it makes me sleepy. So it's hard to - and then my back - I have back issues.
Tr. at 54-55.
After Plaintiff testified, the ALJ called George Paprocki to testify as a vocational expert. Tr. at 77. The ALJ noted that among Plaintiff's job history, only dietary aid and laundry worker were done at substantial gainful activity levels[5] . In her decision, however, the ALJ noted that Plaintiff's past relevant work also included the jobs as waitress, and companion both of which were classified as semi-skilled jobs. Tr. at 34. In response to a hypothetical question which mirrored the ALJ's residual functional capacity finding, the vocational expert opined that Plaintiff's past relevant work as a laundry work was feasible. Tr. at 78. The vocational expert also identified jobs such as merchandise marker, room cleaner at a hotel or motel, and dining room attendant, as other jobs which could be done within the limits of the hypothetical question. Tr. at 79. The vocational expert testified that missing work more than one day per month, more than five days in a 12 month period, would be grounds for dismissal. Tr. at 80. The vocational expert testified that being able to accept criticism from a supervisor is essential: "If you're going to be working, you had better be responsive to what the supervisor says, in terms of maybe changing your procedure or working faster or doing something a little differently." Tr. at 82.
ADMINISTRATIVE DECISION
In her decision, the ALJ wrote that Dr. Brown's treatment records do not document findings commensurate with disability: "For example, in July 2015, and similar to other mental status examinations, the claimant was observed as depressed with moderate to severe anxiety, a restricted affect, and rumination on problems. However, her speech was spontaneous with normal rate and volume; eye contact was fair; no tics or tremors were observed; insight and judgment were fair; psychomotor activity was within normal limits and her interest in life was fair to good, with no medication side effects reported, and an assigned GAF score of 55 (Exhibit 9F)[6] " Tr. at 29.
The ALJ considered the medical source statements provided by Dr. Brown (Tr. at 32-33), but noted that Dr. Brown's rationale was not based on direct observations but rather on the subjective reports of Plaintiff. The ALJ wrote: "The undersigned further points out that the issue of disability is one reserved to the Commissioner." The ALJ noted that often doctors *949 may express an opinion in order to assist a patient or in an effort to satisfy a patient or to avoid unnecessary doctor/patient tension. "While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." Tr. at 33.
The ALJ gave great weight to the opinions expressed by the State agency medical and psychological consultants because the ALJ found their opinions were consistent with the other evidence in the record. The ALJ noted that those doctors "have knowledge of disability program and evidentiary requirements." Tr. at 32.
The ALJ considered a functional report completed by Plaintiff's husband (Tr. at 254-61), in which Plaintiff's anxiety and physical limitations were described. The ALJ found that the totality of the evidence did not support his statements. Tr. at 33.
DISCUSSION
We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. Wagner v. Astrue , 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." Reutter ex rel. Reutter v. Barnhart , 372 F.3d 946, 950 (8th Cir. 2004).
We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.' " Bradley v. Astrue , 528 F.3d 1113, 1115 (8th Cir. 2008) (quoting Nicola v. Astrue , 480 F.3d 885, 886 (8th Cir. 2007) ). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id. (quoting Nicola , 480 F.3d at 886 ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Goff v. Barnhart , 421 F.3d 785, 789 (8th Cir. 2005).
Owen v. Astrue , 551 F.3d 792, 798 (8th Cir. 2008) (alterations in original). In Brand v. Secretary of Dep't of Health, Education and Welfare , 623 F.2d 523, 527 (8th Cir. 1980), Chief Judge Lay wrote that Universal Camera Corp. v. NLRB , 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), is "the guideline for the evaluation of the standard of review." In Universal Camera , the Court wrote:
We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or *950 its informed judgment on matters within its special competence or both.
340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. Gavin v. Heckler , 811 F.2d 1195, 1199 (8th Cir. 1987). In Gavin , the Court wrote:
In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.
Id. (citations omitted).
In short, a reviewing court should neither consider a claim de novo nor abdicate its function to carefully analyze the entire record. Wilcutts v. Apfel , 143 F.3d 1134, 1136-37 (8th Cir. 1998) (citing Brinker v. Weinberger , 522 F.2d 13, 16 (8th Cir. 1975) ).
The most important issue in any disability case that proceeds beyond step three of the sequential evaluation is that of residual functional capacity:
Probably the most important issue will be the question of [residual functional capacity].... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.
McCoy v. Schweiker , 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).
For reversal, Plaintiff argues the ALJ's finding of residual functional capacity is not supported by substantial evidence because Plaintiff's testimony that Plaintiff is unable to work at a competitive pace is not inconsistent with the record as a whole, and because Plaintiff's testimony that she suffers frequent migraine headaches is not inconsistent with the record as a whole. The Court agrees with Plaintiff that the Commissioner's final decision is not supported by substantial evidence on the record as a whole.
In the opinion of the Court, this case turns on whether or not the ALJ gave appropriate weight to the opinion expressed by Dr. Brown. In Papesh v. Colvin , 786 F.3d 1126, 1132 (8th Cir. 2015), the Court discussed the weight to be given to the opinions of treating physicians. The Court cited regulations such as 20 C.F.R. § 404.1527(c)(2), and Social Security Ruling (SSR) 96-2p. The Court noted that even if a treating physician's opinion is not entitled to controlling weight, it should not be disregarded and is entitled to substantial weight, or limited weight. The Court wrote that the opinion may be discounted or even disregarded where other medical assessments are supported by better or more thorough medical evidence, or where the treating physician renders inconsistent opinions. Id. The Court also wrote that the opinions of nonexamining medical sources are generally given less weight than those of the examining sources. Id. at 1133, quoting Wildman v. Astrue , 596 F.3d 959, 967 (8th Cir. 2010).
*951 SSR 96-2p, found at 1996 WL 374188, is entitled Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight To Treating Sources Medical Opinions. The Ruling states that Controlling weight is given to a medical opinion when all of the following are present: 1) the opinion must be from a treating source as defined in 20 C.F.R. § 404.1527(d)(2) and 416.927(d)(2) ; 2) The opinion must be a "medical opinion" about the nature and severity of impairments; 3) the opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, i.e., there must be some reasonable support for the opinion; and, 4) the opinion must also be consistent with the other substantial evidence in the record. The ruling states that when all of the factors are satisfied, "the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion." Id. (bold emphasis added). If the opinion is not given controlling weight, the SSR states that the opinion is still entitled to deference and must be weighed against all the factors provided in 20 C.F.R. § 404.1527 and § 416.927. The SSR states that in many cases, the treating source opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight. The SSR states that 20 C.F.R. § 404.1527 and § 416.927 requires that the adjudicator will always give good reason for the weight that is given to a treating source's medical opinion.
Dr. Brown expressed her medical opinion in a report addressed to Plaintiff's attorney. The doctor wrote that Plaintiff's diagnoses are Major Depressive Disorder, recurrent, severe (see footnote 4, on page 7 above), Generalized Anxiety Disorder, Learning Disability Not Otherwise Specified, and Borderline Intellectual Functioning. Dr. Brown noted that the consequences of these impairments are: difficulty remembering instructions and completing assigned tasks; and, difficulty interacting socially with peers and supervisors. In addition to her own clinical assessment, Dr. Brown noted that her opinion was supported by psychological testing which found a learning disability and borderline intellectual functioning.
Rather than explain the evidentiary weight given to the Dr. Brown's opinion in terms required by the SSR, the ALJ explored the possibility that the doctor's opinion was offered because of sympathy, or possibly to quiet a demanding patient. As Plaintiff points out, this is speculation which is unsupported by any evidence in the record. As the Court noted in Wilder v. Chater , 64 F.3d 335, 337 (7th Cir. 1995), psychiatrists, not lawyers or judges, are the experts on mental illness.
In the opinion of the Court, Dr. Brown is a treating physician, and an acceptable source of medical opinion as defined in 20 C.F.R. § 404.1502(a)(1). Dr. Brown expressed a medical opinion regarding the nature and severity of Plaintiff's impairments, her opinions on matters reserved to the Commissioner notwithstanding. Dr. Brown's opinion is well-supported by medically acceptable clinical diagnostic techniques - including the report of the psychologist to whom Plaintiff was referred by Dr. Brown. Dr. Brown's opinion is consistent with the other substantial evidence in the record. Although the State agency psychological consultants came to different conclusions than did Dr. Brown, the Papesh Court noted that the SSR states that a treating physician's opinion does not have to be consistent with all the other evidence as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion. 786 F.3d at 1132. Furthermore, wrote the Court in Papesh , the opinions of nonexamining medical sources are generally given *952 less weight than those of examining sources. The Court noted that the regulations, found at 20 C.F.R. § 404.1527(c)(3), state that because nonexamining sources have no examining or treating relationship, the weight given to their opinions will depend on the degree to which they provide supporting explanations for their opinions. Id. In the opinion of the Court Dr. Brown's opinion meets all the criteria set forth in SSR 96-2P, and far outweighs the opinions of the non-examining sources.
Because all four of the SSR 96-2p factors were met, it was error for the ALJ not to have given controlling weight to Dr. Brown's opinion. Because of that error, the final decision of the Commissioner is not supported by substantial evidence on the record as a whole.
REMEDY
In Papesh , the Court determined that remand was required to determine if Plaintiff retained transferable skills from his past relevant work. In the case at bar, the ALJ's hypothetical limited Plaintiff to simple, routine, repetitive tasks, so the issue of transferable skills is not relevant to this discussion.
In Tennant v. Schweiker , 682 F.2d 707 (8th Cir. 1982), Tennant suffered from multiple impairments, including a personality disorder and anxiety. The Court noted that the most compelling evidence in the case related to the fact that Tennant had over forty-six jobs in his twelve year work history, none of which were held for any significant length of time. "Tennant has consistently demonstrated a desire to be gainfully employed, but has met with little success." Id. at 710. Likewise, in the case at bar, the record is replete with evidence of Plaintiff's multiple efforts, and failure, to engage in work activity. The Tennant Court noted that hypothetical questions posed to vocational expert was inadequate in that the hypothetical did not precisely set out the claimant's particular physical and mental impairments. After considering the evidence in the record which supported as well as the evidence which detracted from the decision reached by the Secretary, the Court found that Tennant was disabled and the case was reversed with directions to award Tennant the benefits for which he had applied. Id. at 711.
In Gavin v. Heckler , 811 F.2d at 1201, it was noted that the ALJ had stopped the sequential evaluation at step four, finding that Gavin had the residual functional capacity to perform his past relevant work. The Court wrote:
Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand. E.g. , Cook v. Bowen , 797 F.2d 687, 691 (8th Cir. 1986) ; Smith v. Heckler , 735 F.2d 312, 318 (8th Cir. 1984).
In Parsons v. Heckler , 739 F.2d 1334, 1339 (8th Cir. 1984), the Court wrote:
If the record as presented to the ALJ contains substantial evidence supporting a finding that the claimant was disabled, than a reviewing court may reverse and remand the case to the District Court for entry of an order granting benefits to the claimant. See, e.g., Baugus v. Secretary of Health and Human Services , 717 F.2d 443, 448 (8th Cir. 1983) ; Nelson v. Heckler , 712 F.2d 346, 349 (8th Cir. 1983) ; Tennant , 682 F.2d at 710-11 ; Zimiga v. Schweiker , 651 F.2d 611, 613 (8th Cir. 1981).
*953 In the case at bar, Plaintiff, like the claimants in the above cited cases, has proven her case with medical evidence, and the evidence on the record as a whole supports a finding that she is disabled and entitled to the benefits for which she applied. A remand for any further development of the record would only delay the receipt of the benefits to which she is entitled.
CONCLUSION AND DECISION
The Court has considered the evidence that supports, as well as the evidence that detracts, from the decision made by the ALJ. After applying the balancing test noted in Gavin , 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for an award of the benefits to which Plaintiff is entitled.
The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). See McDannel v. Apfel , 78 F.Supp.2d 944, 950-54 (S.D. Iowa 1999) (discussing, among other things, the relationship between the Equal Access to Justice Act and fees under 42 U.S.C. § 406(b)(1) and LR 54.A(b) );[7] see also Gisbrecht v. Barnhart , 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002) ; Mitchell v. Barnhart , 376 F.Supp.2d 916 (S.D. Iowa 2005).
IT IS SO ORDERED.

The Diagnostic and Statistical Manual of Mental Disorders, a publication of the American Psychiatric Association, sets forth a multiaxial assessment that mental health providers find useful when diagnosing and treating mental impairments. Axis I classifies clinical disorders and other conditions that may be a focus of clinical attention. Axis II classifies personality disorders and mental retardation. Axis III classifies general medical conditions. Axis IV classifies psychosocial and environmental problems. And Axis V is a Global Assessment of Functioning (GAF). American Psychiatric Association (APA), Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed., Text Revision 2000) (DSM-IV-TR ).

A schizotypal Personality disorder is a pattern of acute discomfort in close relationships, cognitive or perceptual distortions and eccentricities of behavior. DSM-IV-TR at 685. Personality traits are enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts. Id. at 686.

The GAF scale rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." The GAF uses a scale of 0 (inadequate information) to 100 (superior functioning in a wide range of activities). A rating between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

Mental health professionals rate the severity of diagnoses on a scale of mild, moderate, severe, in partial remission, in full remission, and prior history. The term "severe" is defined as "Many symptoms in excess of those required to make the diagnosis or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning. DSM-IV-TR at 2.

Past relevant work is work that was done within the past 15 years, that was substantial gainful activity, and done long enough to learn the job. 20 C.F.R. § 404.1560(b)(1).

Exhibit 9F is found at pages 409-16 of the transcript.

N.B. Counsel is reminded that LR 54.A(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."